Per Curiam.

Although defendant asked for neither a directed verdict nor judgment notwithstanding the verdict in the trial court, it contends here that it is entitled to final judgment because there is a total absence of evidence establishing any liability on its part. The determination of whether that is true or not has required a complete review of the record.
The entire sequence of transmissions from the tower radio was made simultaneously on two frequencies, one used by the Navy and the other by commercial aircraft, including defendant. Thus both the Navy airplane and the American airplane could hear all transmissions from the tower, although they could not hear transmissions from each other. The captain and the first officer of the American airplane were using headsets for the receipt of radio transmissions from the tower. They heard every broadcast from the tower (a transcript of those broadcasts was an exhibit in the trial) except the one critical transmission which would have warned them that the Navy airplane had been instructed to pursue the identical final approach given to them.
Although it was qualified somewhat as to the type of distractions that might cause a flight officer not. to hear a particular transmission, the testimony of the first officer in connection with this longest single transmission was as follows:
“Q. Well, let me put it this way, then: The only reasons that you wouldn’t hear transmissions from the tower are that you either aren’t paying attention, or you are distracted by something else you are doing? A. Well, that . . .
“Q. Is that fair? A. Yes, I think that would be a fair statement.
*314 “Q. Now, there are two of you in the plane who are supposed to be listening to the radio, is that right? A. That’s right. ’ ’
Although the captain and the first officer denied hearing the instructions given the Navy airplane to also follow the TWA, both of them recalled hearing the transmission that indicated that the American and Navy airplanes were on the same final approach, with the Navy airplane below, behind and to the right of American. But immediately preceding this transmission, the tower radio advised another Navy airplane, number 284 (presumably on the ground), that “I still have two aircraft inbound for landing runway two seven.” (Unfortunately, the log of radio transmissions does not indicate the time lapse between broadcasts. The tower operator, however, testified that the entire lapse of time between the first position report from American flight 572 and the collision was five minutes.)
As one explanation for not hearing the transmission which put both airplanes in the same pattern, the testimony of the officers of American flight 572 was to the effect that the Navy airplane was not “traffic” for them because they believed it was using runway 30.
It is apparent, however, that the American and the TWA airplanes approaching runway 27 were considered by the tower operator as traffic for the Navy airplane even when it was approaching runway 30. The broadcast, admittedly heard by the American officers, was:
“Seven seven three, continue approach for runway three zero. Traffic is on final approach and also on right-hand downwind for runway two seven. I’ll get you in on three zero as soon as practical.” (Emphasis added.)
The following excerpts of testimony, all elicited from either the captain or the first officer of the American airplane, are pertinent:
“Q. Here we are. Read for the jury this one here. A. (reading) ‘Responsibility of pilot. When flying in visual flight rule weather it is considered the direct responsibility of the pilot to avoid collision with other aircraft. Under such conditions the information and clearances issued by the control tower *315 are intended to aid pilots to the fullest extent in avoiding collisions. ’
‘‘ Q. Thank you, and were you, by the way, flying in visual flight rule weather? A. We were.
“Q. Therefore, it would be your understanding, also, that in those conditions the information and clearance issued by the control tower were intended to aid you to the fullest in avoiding collisions. A. That’s right.
“Q. The responsibility remained yours? A. That’s right.
£ £ #
“Q. In connection with the clearing either to approach or to land, and your responsibility in that, I wonder if I could read to you a section of the Pilot’s Radio Handbook of the CAA, and ask you whether or not you think that this is a fair approximation of the rule that you ordinarily follow: ‘In this connection a clearance issued by the tower, such as cleared to land, either by radio or visual signal, is permissive in nature and does not relieve the pilot of the responsibility of exercising a reasonable degree of caution in executing the provision of the clearance.’ Is that correct? A. That is correct.
£ £ # *
“Q. At all times and especially at that time the responsibility rested with you to find out about their aircraft within the vicinity of the airport, isn’t that true? * * * A. Yes, we are supposed to observe traffic at all times.
£ £ * * *
“Q. Captain, the fact that you were clear to land No. 2 by the tower doesn’t relieve you of the direct responsibility of looking for other aircraft, does it? A. No, it does not.
£ £ # # 3?
“Q. Suppose the tower makes a mistake, does that ever happen? A. Yes it does.
“Q. Who is supposed to watch out? A. Naturally, it all rests on the pilot.
£ £ # * *
“Q. Now, while you do have that regulation regarding your conduct in the control zone, I will ask you if there are any other regulations regarding the pilot’s duties to observe for traffic *316 and, if so, what in general is that? A. Yes, sir. Those regulations are to the effect that the pilots should observe traffic at all times, and that they are responsible for any traffic.
“Q. That is the direct responsibility of the pilot, is that right, sir? A. Yes, that’s correct.
i 6 * * *
“Q. Captain Pollard, tell us when, if at all, you knew that the naval Beechcraft was operating in the vicinity of the airport. A. I believe sometime, the time we entered downwind on possibly a little before, then, we realized that there was a Navy Beechcraft, told making an approach for 30.
i i # # *
“Q. Did you ever look to find out where he was? A. Of course, we observed the traffic at all times.
“Q. Well, did you observe him? A. I never observed him, no.
“Q. At no time at all? A. At no time.
< Í # # fc
í t q_ # >* * wh.en you were on downwind leg, did you specifically look for this specific airplane, the Beechcraft? A. Yes.
“Q. Did you see it? A. No.
ii* # *
“Q. When you were on base leg, did you specifically look for the Navy aircraft? A. Yes.
“Q. Did you see it? A. No.
t £ * *
“Q. Now, sir, I was asking you why you specifically looked for this specific aircraft if you did not consider it to be traffic? A. Well, you always like to know where they are.
“Q. Well, isn’t that because you think there might be some possible danger of collision? A. I suppose so.”
The defendant here is a common carrier. As such it owes a duty to exercise the highest degree of care for the safety of its paying passengers. One phase of that duty required the officers in charge of its airplane to maintain a lookout for other aircraft and to avoid, if possible, a collision therewith. It is apparent that at some point in the landing pattern of the defendant’s airplane, either while it was turning onto the base leg of the landing, while on the base leg, or while turning onto the fi *317 nal approach, the defendant’s airplane and the Navy airplane must have been facing each other. Whether, under those circumstances, the officers in charge of the defendant’s airplane exercised the degree of care required of them raised a question of fact for the jury.
Since we are of the opinion that a question of fact was presented for determination by the jury as to the events which preceded the landing of the airplane, it is not necessary to discuss the alleged negligence of the stewardess as to the manner in which she evacuated the plaintiff. However, a majority of the members of the court believe that there was no question for the jury as to the conduct of the stewardess, and that she could not be criticized for choosing, in the crisis created by the crash, one means of egress over another, both or either of which are considered approved procedures by the defendant.
Accordingly, the judgment of the Court of Appeals is affirmed.

Judgment affirmed.

Zimmerman, Taet, Matthias, Bell and Peck, JJ., concur.
Weygandt, C. J., and Herbert, J., dissent.